IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Ronald Hall, | ) | C/A No.: 2:16-583-BHH-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

_____

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2013. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I. Relevant Background

A. Procedural History

On March 12, 2013, Plaintiff protectively filed an application for SSI in which he alleged his disability began on March 1, 1998. Tr. at 64 and 137–45. His application was denied initially and upon reconsideration. Tr. at 77–80 and 82–86. On November 12, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 33–54 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 9, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 17–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 25, 2016. [ECF No. 1].

B. Plaintiff's Background and Medical History

1. Background

Plaintiff was 41 years old at the time of the hearing. Tr. at 36. He completed high school and three years of college. Tr. at 37. He has no past relevant work ("PRW"). Tr. at 22. He alleges he has been unable to work since March 1, 1998. Tr. at 137.

2. Medical History

Plaintiff was transported to Kirkland Correctional Institution on June 11, 2012, after having served 154 days in county jail for a probation violation. Tr. at 223. He reported a lengthy history of mental health hospitalizations and indicated he had been diagnosed with paranoid schizophrenia and bipolar disorder. Tr. at 223–24. He stated he

had been released from federal prison in October 2003, after having served a 34-month sentence. *Id.* He denied suicidal and homicidal ideations and auditory and visual hallucinations. Tr. at 224. Human Services Coordinator Clyde Holliday ("Mr. Holliday") observed Plaintiff to have some hyperverbal speech, but indicated his affect was within normal limits. *Id.* He referred Plaintiff to the mental health clinic. *Id.*

A health summary from the South Carolina Department of Corrections ("SCDC") dated July 12, 2012, indicates Plaintiff was to perform "NO WORK WITH COMPLEX INSTRUCTIONS." Tr. at 208.

Plaintiff presented to Edmund S. Higgins, M.D. ("Dr. Higgins"), on July 11, 2012. Tr. at 222–23. He denied depression and indicated his energy and appetite were good. Tr. at 222. He denied suicidal and homicidal ideations, mood swings, and auditory hallucinations. *Id.* Dr. Higgins observed Plaintiff to be alert, calm, and cooperative. *Id.* He noted Plaintiff was a little upset about his max out date, but was not overly psychotic. *Id.* He ordered Haldol injections to be administered every two weeks. Tr. at 223. Plaintiff received a Haldol injection on July 16, 2012. Tr. at 222.

Plaintiff complained of a depressed mood on July 23, 2012. Tr. at 221. He denied suicidal and homicidal ideations and auditory and visual hallucinations. *Id.* He endorsed a history of alcoholism and marijuana and cocaine abuse. Tr. at 222. Mohan Sridaran, D.O. ("Dr. Sridaran"), observed Plaintiff to be in no acute distress; to have normal speech rate, rhythm, and tone; to demonstrate no abnormal movements; to have a linear thought process; and to have no signs of paranoia, mania, or delusions. *Id.* He diagnosed a history of schizoaffective disorder, bipolar-type disorder, alcohol abuse, cannabis abuse, and

cocaine dependence. *Id.* He indicated Plaintiff's symptoms were well-controlled on Haldol. *Id.* He stated Plaintiff would require outpatient mental health care, but was capable of performing basic work, such as sweeping and mopping. *Id.*

Plaintiff received Haldol injections on July 30 and August 27, 2012. Tr. at 221.

Plaintiff presented to Human Services Coordinator Michelle Fox ("Ms. Fox"), on September 10, 2012, after having been transported to Evans Correctional Institution. Tr. at 219. He reported that he was in need of his Haldol injection. *Id.* Plaintiff's dorm lieutenant explained that Plaintiff was observed to be engaging in bizarre behavior in the dorm that included punching a wall with both fists and talking to himself. *Id.* She indicated that his cellmate reported that Plaintiff had not slept in several nights. *Id.* Ms. Fox noted that Plaintiff appeared hyper and was "shadow karate fighting." *Id.* Plaintiff reported racing thoughts and indicated he heard voices. *Id.* Eileen Delaney, APRN ("Ms. Delaney"), observed that Plaintiff was manic and had constant inappropriate and circumstantial speech. Tr. at 220. She assessed schizoaffective disorder and bipolar disorder and prescribed Haldol, Carbamazepine, and Remeron. *Id.* Ms. Fox indicated they would attempt to stabilize Plaintiff with medication, but would recommend an alternative placement if the medication was unsuccessful. Tr. at 219–20. She assessed a global assessment of functioning ("GAF") score[2] of 60[3] and indicated Plaintiff did not appear to be a danger to himself or others. Tr. at 220.

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF

Plaintiff presented to Ms. Fox on September 10, 2012, after he was observed to be ramming his head into a wall. Tr. at 218. He reported that he was being yelled at by another inmate and wanted to show the inmate that he did not fear him. *Id.* Ms. Fox encouraged Plaintiff to refrain from behavior intended to scare others. Tr. at 219. She indicated Plaintiff's mood and affect were manic, but that he did not appear to be a danger to himself or others. *Id.* She assessed a GAF score of 60. *Id.*

On September 11, 2012, Ms. Fox visited Plaintiff in the holding cell, after his dorm lieutenant reported that he was stripping his clothes off. Tr. at 218. Plaintiff indicated to Ms. Fox that he had been placed in the holding cell because he had obtained a tattoo on the prior night. *Id.* He indicated he felt the effects of a decrease in Haldol. *Id.* Ms. Fox noted that Plaintiff's medications that were ordered on the prior day had not yet been delivered. *Id.* Plaintiff indicated he did not understand why he was being locked up for "GETTING A TATTOO THAT HE SAID HE WANTED" and "SAYING THAT HE WANTS SEVERAL MORE BEFORE GOING HOME." *Id.* Ms. Fox observed that Plaintiff was oriented and alert times three; had hygiene and grooming within normal limits; and denied suicidal and homicidal ideations and auditory and visual hallucinations. *Id.* She assessed bipolar disorder with psychotic features and stated

---

scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*
[3] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

Plaintiff was manipulative. *Id.* She indicated his GAF score was 70.[4] *Id.* She stated Plaintiff appeared to be skilled at the art of manipulation and used his mental health as an excuse for bad choices. *Id.*

Ms. Fox was contacted again after the dorm classification officer reported that Plaintiff was observed to be naked and turning cartwheels in the dorm. Tr. at 217. Ms. Fox observed when she arrived that Plaintiff was lying on a wooden bench, holding his fingers above his head, and talking to his fingers. *Id.* She indicated she informed Plaintiff that she had received reports that he was naked and turning cartwheels. *Id.* Plaintiff informed her that he was practicing karate moves and indicated he was unaware of his bizarre behavior. *Id.* Ms. Fox recommended that Plaintiff be placed in a crisis intervention cell without property or clothes; receive only finger foods; and be observed every 15 minutes. Tr. at 218.

On September 12, 2012, Ms. Fox noted that Plaintiff was talking and singing to himself and "seem[ed] kind of oblivious." Tr. at 217. Plaintiff later denied mental health concerns and requested that he be removed from crisis intervention. *Id.* He denied the incident from the prior day as if he had no memory of it and stated that "there appear[ed] to be some false information circulating." *Id.* Human Services Coordinator Iris K. Ham ("Ms. Ham") described Plaintiff as having poor eye contact and pressured/rapid-paced speech. *Id.* She recommended Plaintiff remain on crisis intervention protocol. *Id.*

---

[4] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR*.

On September 13, 2012, Plaintiff reported that his hallucinations had stopped during the prior evening. Tr. at 216. He denied suicidal and homicidal ideations. *Id.* Ms. Ham observed Plaintiff to have poor eye contact and pressured speech. *Id.* She indicated Plaintiff appeared to be in continued distress and recommended that he remain on crisis intervention protocol. *Id.*

On September 17, 2012, Plaintiff was alert and oriented; denied ideations of self-harm; denied problems with sleep and appetite; denied recent auditory and visual hallucinations; was compliant with his medications; and reported no side effects. Tr. at 215. Paul C. Draco, M.D. ("Dr. Draco"), observed Plaintiff to maintain good eye contact; to have soft speech; to be calm; and to have a mood and affect within normal limits. *Id.* He recommended that Plaintiff be removed from crisis intervention status and returned to a regular treatment plan. *Id.*

Plaintiff tolerated Haldol injections without complications on September 24 and October 10, 2012. Tr. at 214–15. On October 10, 2012, Plaintiff denied acute mental health distress. Tr. at 214. Ms. Fox observed Plaintiff's hygiene to be within normal limits and indicated he was alert and oriented times three. *Id.* She stated Plaintiff did not appear to be a danger to himself or others. *Id.* She indicated a two-man cell would be required because of Plaintiff's "special needs." *Id.*

Plaintiff tolerated Haldol injections well on October 24, and November 9, 2012. Tr. at 214.

Plaintiff consulted with Ms. Delaney by video on November 26, 2012. Tr. at 213–14. He indicated that his mood had calmed and that he was reading a lot and was getting

along well. *Id.* He denied racing thoughts and reported he was sleeping well and had a good appetite. Tr. at 214. Ms. Delaney observed Plaintiff to have unpressured speech, linear thoughts, and good eye contact. Tr. at 214. She prescribed Haldol injections, Remeron, and Carbamazepine. *Id.*

Plaintiff received a Haldol injection on December 4, 2012. Tr. at 213.

On December 11, 2012, Ms. Fox noted Plaintiff was cooperative; oriented and alert times three; had normal grooming and hygiene; denied suicidal and homicidal ideations, and was compliant with his medications. Tr. at 212. She assessed a GAF score of 75[5] and indicated Plaintiff did not appear to be a danger to himself or others. *Id.* Plaintiff received a Haldol injection. Tr. at 213.

Plaintiff received another Haldol injection on January 1, 2013. Tr. at 213. He attended a discharge planning session on January 9, 2013. Tr. at 212. He stated he intended to live with his father in Hilton Head for a few months until he could "make a couple thousand dollars then move to Florence." *Id.* Ms. Fox advised Plaintiff that he would be ineligible for treatment at Pee Dee Mental Health while he was living in Hilton Head. *Id.* Plaintiff indicated he would obtain his medication from Beaufort Mental Health. *Id.*

---

[5] A GAF score of 71–80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument) and that the individual has no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

Plaintiff received a Haldol injection on January 24, 2013, but refused to report to the medical unit for an injection on February 8, 2013. Tr. at 212. He subsequently reported for an injection on February 11, 2013. *Id.*

On February 19, 2013, Plaintiff reported that he was so angered by his cellmate that he had punched the cement wall and broken his hand. Tr. at 211. He indicated that he had subsequently argued with another inmate while he was being transported to the medical unit. *Id.* Ms. Fox indicated that Plaintiff had become calm and that his speech had become more normal and less rapid after she told him that he could remain in the psychiatric clinic for the day. *Id.* She stated Plaintiff "instantly became angry again" when he encountered the inmate with whom he had the earlier altercation. *Id.* She encouraged Plaintiff to use breathing exercises, and Plaintiff again became calm. *Id.* However, when Ms. Fox returned after having left the room, Plaintiff was again irate. *Id.* Ms. Fox assessed a GAF score of 60. *Id.* She stated Plaintiff did not appear to be a danger to himself or others, but was causing concern with his reported anger level. *Id.*

On February 25, 2013, Linda C. Tyler, R.N. ("Ms. Tyler"), administered Plaintiff's Haldol injection. Tr. at 211.

Plaintiff met with Ms. Fox on February 28, 2013, to discuss his plan for discharge. Tr. at 211. Ms. Fox noted that Plaintiff's father had scheduled medical appointments for him and that he was to stay with his father on a temporary basis. *Id.* She related a plan for Plaintiff to move to Florence to live independently and follow up with Pee Dee Mental Health once his benefits were reinstated. *Id.*

Plaintiff presented to Coastal Empire Mental Health Center on March 8, 2013, to establish treatment. Tr. at 229. He reported a history of mental health problems that had begun with paranoia and manic episodes in 1998. *Id.* He indicated his manic episodes were characterized by being awake for two to three days at a time, feeling euphoric, crashing, and going to jail. *Id.* He stated his medications were working well and he endorsed good energy and adequate rest. *Id.* He indicated he was helping his father with air conditioning work. *Id.* He denied paranoia, manic episodes, hearing voices, and experiencing hallucinations since being on his medications. *Id.* He endorsed a history of alcohol and drug abuse, but indicated he had not used any substances within the last year. *Id.* Kellie C. Bishop, M.D. ("Dr. Bishop"), noted Plaintiff had fair judgment and insight, but indicated his mental status was otherwise normal. Tr. at 230. She diagnosed schizoaffective disorder and polysubstance dependence in full remission and assessed a GAF score of 60. *Id.* She prescribed Remeron and Tegretol to be taken daily and Haldol injections to be administered every four weeks. *Id.*

Plaintiff presented to social worker Omega L. Smalls-Francis ("Ms. Smalls-Francis") on March 13, 2013. Tr. at 232. He endorsed a history of chronic mental illness and drug abuse. *Id.* He indicated he was attending daily Alcoholic Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. Tr. at 233. Ms. Smalls-Francis indicated Plaintiff's poor decisionmaking had adversely affected him. Tr. at 235. She indicated Plaintiff acknowledged, but failed to understand, his problems. *Id.* She assessed a GAF score of 60. *Id.*

Plaintiff followed up with Dr. Bishop on May 15, 2013. Tr. at 242. Dr. Bishop noted that Plaintiff's father had complained that he had been disrespectful and hostile. *Id.* Plaintiff reported he had difficulty concentrating when he was "writing his stories and trying to channel people from another planet." *Id.* He admitted to having taken his sister's Adderall and indicated it had made him feel more coherent. *Id.* He denied having used drugs or alcohol, but declined a urine drug screen. *Id.* Plaintiff stated he had attempted a painting job, but had lost it because he was "accused of flirting with a wom[a]n." *Id.* He indicated his sleep and appetite were good and his energy level was very high. *Id.* He reported seeing some shadows and hearing voices. *Id.* Dr. Bishop indicated Plaintiff's mental status was abnormal. Tr. at 243. She assessed a GAF score of 60. *Id.* She increased Plaintiff's Haldol dosage to 50 milligrams every two weeks and encouraged Plaintiff to abstain from polysubstance use. *Id.*

On May 23, 2013, state agency psychological consultant Lisa Clausen, Ph. D. ("Dr. Clausen"), reviewed the record and completed a psychiatric review technique ("PRT"). Tr. at 58–59. She considered Listings 12.03 for schizophrenic, paranoid, and other psychotic disorders; 12.04 for affective disorders; and 12.09 for substance addiction disorders. Tr. at 58. She found that Plaintiff had mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* She noted that Plaintiff had been "free of polysubstance abuse" since he was incarcerated in July 2012 and showed improvement in overall functioning while he was incarcerated. *Id.* State agency psychological consultant John Petzelt, Ph. D. ("Dr. Petzelt"), assessed the same level of

11

restriction on July 31, 2013. Tr. at 69–70. He stated Plaintiff's allegations were "fully credible" and found that his "condit[i]ons were improved on meds. and with sobriety." Tr. at 69.

Dr. Clausen also completed a mental residual functional capacity ("RFC") assessment. Tr. at 60–61. She found that Plaintiff was moderately limited with respect to his abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. *Id.* She stated Plaintiff was "capable of performing simple tasks for at least two hour periods of time"; "would be expected to occasionally miss a day of work secondary to his/her symptoms"; was "expected to have difficulty working in close proximity or co-ordination with co-workers"; "would be expected to have difficulty understanding, remembering and carrying out detailed instructions"; was "capable of single, repetitive tasks w/out special supervision"; could "attend work regularly and accept supervisory feedback"; and "would be best suited for a job which does not require continuous interaction with the general public." Tr. at 61. Dr. Petzelt indicated many of the same findings as Dr. Clausen on a mental RFC assessment, but found that Plaintiff was not significantly limited in his abilities to perform activities within a schedule,

maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. *Compare* Tr. at 60–61, *with* Tr. at 71–73. He stated Plaintiff was capable of performing simple tasks for at least two-hour periods of time; would be expected to have difficulty understanding, remembering, and carrying out detailed instructions; was capable of single, repetitive tasks without special supervision; could attend work regularly and accept supervisory feedback; and would be best-suited for a job that did not require continuous interaction with the general public. Tr. at 72–73.

On February 21, 2014, Plaintiff reported he was doing well. Tr. at 247. He indicated he was doing some work with his dad and was attempting to complete massage school. *Id.* He stated his focus was good and that he continued to write and to do pretty well on the job. *Id.* He reported good sleep and appetite and denied auditory and visual hallucinations, delusions, paranoia, and irritability. *Id.* Dr. Bishop noted no abnormalities on a mental status examination. Tr. at 247–48. She assessed a GAF score of 60. Tr. at 248. She indicated she would discontinue Plaintiff's oral medications. *Id.*

On October 1, 2014, Plaintiff reported that he was doing well. Tr. at 249. He indicated he had been unable to afford to return to massage school, but was doing some work with his father. *Id.* He reported his thinking was clear, but that he had some problems with reading comprehension. *Id.* He denied psychotic symptoms and reported good sleep and appetite and okay energy. *Id.* He indicated he was attending daily NA

meetings and was maintaining his sobriety. *Id.* Dr. Bishop noted no abnormalities on examination. *Id.* She assessed a GAF score of 60. *Id.* She stated Plaintiff was "likely to qualify for disability due to his severe mental illness." Tr. at 250.

Dr. Bishop completed a mental assessment form on October 24, 2014. Tr. at 251–56. She stated Plaintiff had been diagnosed with schizoaffective disorder. Tr. at 252. She indicated she had begun to treat Plaintiff on March 8, 2013, but that he had been receiving treatment since 1998. *Id.* She stated Plaintiff was not currently abusing alcohol or other drugs. *Id.* She reported that Plaintiff received Haldol injections every two weeks. *Id.* She identified Plaintiff as having the following clinical abnormalities that presented on a continuous or intermittent basis: delusions or hallucinations; illogical thinking; loosening of associations; and inappropriate affect. *Id.* She assessed Plaintiff as having marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. Tr. at 253. She confirmed that Plaintiff had a history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activities, but with symptoms or signs that were currently attenuated by medical or psychosocial support. *Id.* She indicated Plaintiff had repeated episodes of decompensation, each of extended duration; a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate; and a current history of one or more years' inability to function outside of a highly supportive living arrangement, with an indication

of continued need for such an arrangement. *Id.* Dr. Bishop declined to address Plaintiff's specific RFC and limitations. Tr. at 254–55. She wrote the following: "Patient has long standing severe mental illness that is unlikely to remit. Pt is clearly disabled and would not be able to be gainfully employed in a manner in which he could meaningfully support himself." Tr. at 256.

### C. The Administrative Proceedings

#### 1. The Administrative Hearing

##### a. Plaintiff's Testimony

At the hearing on November 12, 2014, Plaintiff testified that he had not worked since 1998, when he was diagnosed with paranoid schizophrenia. Tr. at 37. He indicated he was diagnosed with bipolar disorder while he was incarcerated in federal prison in 2000. Tr. at 38. He claimed he had been hospitalized 25 to 30 times since 1998, but he denied having been hospitalized since 2013. Tr. at 38 and 45. He testified that he had received SSI benefits from 2005 until 2012. Tr. at 37. He indicated his benefits were terminated when he was incarcerated. Tr. at 37–38.

Plaintiff testified that he sometimes experienced auditory and visual hallucinations. *Id.* He indicated he had difficulty following directions, completing tasks, and taking directions from others. *Id.* He stated he had comprehension problems. Tr. at 40. He endorsed difficulty forming friendships and relationships and indicated the only phone numbers he had saved in his cell phone directory were for his father, mother, and sister. Tr. at 39. He stated he felt paranoid and had difficulty trusting others. *Id.* He

endorsed a history of suicidal thoughts. Tr. at 41. He indicated he had never been able to manage his money. *Id.*

Plaintiff testified that he had behaved recklessly and irrationally when he was not taking his medication and was in a manic state. Tr. at 38. He described his manic state as being characterized by visual hallucinations of demons and ghosts. Tr. at 40. He stated he received a 50-milligram Haldol injection every two weeks, but was unable to afford any additional mental health treatment. Tr. at 43. He denied taking oral medications and reported that he had reacted negatively to some oral medications in the past. Tr. at 44–45. He indicated Haldol helped to "slow [him] down," but also made it difficult for him to be productive. Tr. at 38. He testified that it prevented him from becoming "too manic" and "too depressed." Tr. at 41. He indicated it caused him to sleep for long periods, and indicated he had slept for over 24 hours prior to the hearing. *Id.* He stated his medication caused him to experience dry mouth, shakiness, and a twitch. Tr. at 40.

Plaintiff testified that he lived with a roommate in a trailer on four acres of land. Tr. at 40 and 43. He indicated his father paid his rent, purchased his groceries, and gave him some spending money. *Id.* He testified he enjoyed painting. Tr. at 38. He stated he was able to do small jobs like raking the yard and cleaning the house, but that he often had difficulty completing tasks. Tr. at 39. He indicated he attended church and AA and NA meetings. Tr. at 42. He stated he had not had a driver's license in seven years. *Id.*

Plaintiff testified that he was unable to work because he was unable to be exposed to direct sunlight while taking Haldol. Tr. at 46. He stated he would have difficulty

performing an indoor job because of difficulty comprehending and following directions. *Id.*

                b.        Witness Testimony

Plaintiff's father Ronald William Hall ("Mr. Hall") testified at the hearing. Tr. at 46–52. He indicated Plaintiff had played baseball and football in high school and Division I football in college. Tr. at 47. He stated Plaintiff never missed practice; was always energetic; and was one of the best players on the team. *Id.* He indicated that Plaintiff left the locker room after a college football game and told him that he could no longer take "these beatings." *Id.* He stated Plaintiff came home the following Christmas and informed his mother that he wanted to kill himself. Tr. at 48. He indicated some of his family members had attempted to have Plaintiff committed to a psychiatric facility, but that he had arranged for Plaintiff to receive outpatient psychiatric treatment. *Id.*

Mr. Hall stated that Plaintiff's mental condition had deteriorated over the prior 20-year period and that Plaintiff had spent most of his time between jails and hospitals. Tr. at 48–49. He indicated Plaintiff's doctors had experimented with many medications. Tr. at 48. He stated that Plaintiff tended to stop taking his medication when he started to feel good. Tr. at 48–49. He indicated Plaintiff had "no concept of money" and could spend $5,000 in a couple of days during a manic phase. Tr. at 49. He stated Plaintiff would not eat. *Id.* He testified that Plaintiff would commit simple offenses during his manic phases that would result in him being incarcerated. *Id.* He indicated that with help from the South Carolina Department of Mental Health, he had obtained a court order directing Plaintiff to take Haldol injections. Tr. at 48.

Mr. Hall testified that Plaintiff maintained his home in a "livable" manner, but that it was not "nice and tidy." Tr. at 50. He indicated Plaintiff's personal hygiene was not very good. *Id.* He stated that he owned an air-conditioning company and sometimes took Plaintiff to work with him. *Id.* He testified that if he left Plaintiff unsupervised, he would be likely to take a nap in the homeowner's bed. *Id.*

Mr. Hall testified that Plaintiff was unable to work because he was incapable of taking directions and following instructions. Tr. at 51. He stated Plaintiff was unable to "finish a task no matter what you put him at." *Id.* He indicated Plaintiff's medication kept "him leveled out at a point to where he's not wanting to go roaming around town and getting himself in trouble." *Id.* He stated the Haldol helped Plaintiff to remain stable, but would not allow him to hold down a full-time job. Tr. at 52.

### 2. The ALJ's Findings

In his decision dated February 9, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since March 12, 2013, the application date (20 CFR 416.971 *et seq.*).
2. Claimant has the following severe impairment: schizoaffective disorder (20 CFR 416.920(c)).
3. Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4. After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: claimant can understand, remember and carry out simple instructions. He may have no ongoing public interaction.
5. Claimant has no past relevant work (20 CFR 416.965).

6. Clamant was born on July 8, 1973 and was 39 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. Claimant has at least a high school education and is able to communicate in English (20 CFR 416.968).

8. Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 416.968).

9. Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 416.969 and 416.969(a)).

10. Claimant has not been under a disability, as defined in the Social Security Act, since March 12, 2013, the date the application was filed (20 CFR 416.920(g)).

Tr. at 22–29.

## II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ erred in failing to consider the prior finding of disability as a significant evidentiary fact; and

2) the ALJ did not consider Plaintiff's non-exertional impairments in finding him capable of performing a full range of sedentary unskilled work.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for
at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings

of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Prior Award of Disability Benefits

Although the record before the court lacks a prior administrative decision, a disability determination explanation shows that Plaintiff was awarded SSI benefits on

February 1, 2005,[8] and that his benefits were subsequently ceased because he was incarcerated. Tr. at 56 and 57. Pursuant to 20 C.F.R. § 416.1325(a), an SSI recipient "is ineligible for benefits for the first full calendar month in which he or she is a resident of a public institution" and continues to be ineligible for benefits "for so long as such individual remains a resident of a public institution." If an individual remains a resident of a public institution for more than 12 consecutive months, the Social Security Administration ("SSA") will terminate his benefits. 20 C.F.R. § 416.1335. It appears that Plaintiff was incarcerated in county jail beginning on or about January 9, 2012, was transferred to the SCDC on or about June 11, 2012 (Tr. at 223), and remained incarcerated until March 1, 2013 (Tr. at 211). Thus, his SSI benefits were terminated in accordance with 20 C.F.R. § 416.1335 because he was incarcerated for greater than 12 months.

Plaintiff argues the ALJ erred in failing to consider that he had previously been awarded SSI benefits that were terminated because of his incarceration, but not for medical improvement. [ECF No. 10 at 12]. He maintains that the prior finding of disability should have been considered and weighed as a finding of fact as to disability. *Id.*

The Commissioner argues that an eight-year gap existed between the prior finding of disability and the start of the relevant period. [ECF No. 11 at 7]. She maintains that the medical records from the prior claim were not included in the current record and that the

---

[8] It appears Plaintiff was awarded benefits at the initial administrative level and that his claim did not require a hearing before an ALJ. *See* Tr. at 56.

ALJ was not required to develop the record that pertained to a period eight years prior to Plaintiff's alleged onset date. *Id.* at 7–8. She contends the evidence from the relevant period showed Plaintiff to be responding well to treatment, performing some work activity related to his father's business, and engaging in significant ADLs. *Id.* at 8.

Both parties argue that cases outside the Fourth Circuit provide a proper framework for decisionmaking. Plaintiff leans heavily on *Richardson v. Astrue*, No. 10-9356-DAB-AJP, 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011), *aff'd*, 2011 WL 3477523 (S.D.N.Y. Aug. 8, 2011), which held that in cases where claimants' disability benefits are terminated for non-medical reasons, ALJs are required "to explain why a different conclusion should apply" with respect to new claims for benefits. The Commissioner cites *Saxon v. Colvin*, No. 14-782, 2015 WL 4999700, at *4 (N.D. Ala. Aug. 21, 2015), which held that the plaintiff was not prejudiced by the ALJ's failure to obtain the file from her previous claim.

In *Richardson*, the plaintiff had been granted disability benefits on September 22, 2000, but his benefits were terminated because of his incarceration in May 2001.[9] *Richardson*, 2011 WL 2671557, at *1 n.1. After being released from prison in March 2008, the plaintiff alleged in a new application that he had been disabled since October 15, 1996. *Id.* at *1. Although the court recognized that the Second Circuit had not resolved the issue of whether a claimant whose disability benefits were terminated for non-medical reasons was entitled to a presumption that his disability continued, it found

_____

[9] The *Richardson* plaintiff was incarcerated between May 2001 and March 2008. *Richardson*, 2011 WL 2671557, at *2.

it necessary for the ALJ to explain his reasons for deviating from the prior finding, particularly where the current application was "predicated on the same condition for which [the plaintiff] was previously granted SSI benefits." *Id.* at *12.

In *Saxon*, 2015 WL 4999700, at *4, the plaintiff had received disability benefits from May 26, 1992, until May 1, 2001,[10] and alleged in a subsequent claim that she became disabled on May 1, 2001. *Saxon*, 2015 WL 4999700, at *4. The court stated it was "important to note at the outset that this action does not challenge the Administration's termination of Mrs. Saxon's earlier period of disability benefits," but instead "alleges a new period of disability beginning on May 1, 2001." *Id.* It found that the prior claim was material to the case before the ALJ "only if it contain[ed] information relevant to [the plaintiff's] condition on or after May 1, 2011." *Id.* It explained that it "should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice" and that it did not "see any evidentiary gaps that would have been cured by consideration of the prior records." *Id.* It noted that the evidence pertained to a period nine years prior and that the plaintiff did not "explain how the records associated with the previous claim relate[d] to the current alleged period of disability." *Id.*

The instant case is more akin to *Richardson* than to *Saxon* for a couple of reasons. First, unlike the plaintiff in *Saxon*, Plaintiff alleged an onset date prior to his termination of benefits. *See* Tr. at 137 (alleging he became unable to work on March 1, 1998).

_____

[10] The decision states that the record does not include the basis for the termination of benefits.

Although the SSA treated his application as a new claim for benefits, Plaintiff maintained that he remained unable to work because of the same impairments that had disabled him prior to his incarceration. *See id.* Second, like the plaintiff in *Richardson*, Plaintiff's benefits were terminated because of his incarceration. Had Plaintiff been incarcerated for fewer than 12 months, his benefits presumably would have been reinstated following his release from prison. *See* 20 C.F.R. § 416.1325(b) ("If benefits are otherwise payable, they will be resumed effective with the earliest day of the month in which a recipient is no longer a resident of a public institution."). Despite similarities between this case and *Richardson*, this court is not bound by that court's decision. Nevertheless, mitigating in favor of giving some weight to the prior disability finding are the fact that Plaintiff's disability benefits were discontinued for non-medical reasons and that he alleged he remained disabled because of his mental impairments from 1998 through the date of the ALJ's decision.

Although the Fourth Circuit has not addressed whether ALJs are required to explicitly consider and explain their reasons for deviating from a prior finding of disability in cases where the individual's benefits were terminated for non-medical reasons, two cases provide a general framework for considering prior administratively-final decisions. In *Albright v. Commissioner of Social Sec. Admin.*, 174 F.3d 473, 477 (4th Cir. 1999), the court found that, although it is generally appropriate to consider a new claim apart from a prior claim, in some cases "[p]rinciples of finality and fundamental fairness drawn from [42 U.S.C.] § 405(h)" and the substantial evidence rule prohibit ALJs from rejecting prior administrative findings without providing adequate

reasons for doing so. [11] It stated that in *Lively v. Secretary of Health and Human Services*, 820 F.2d 1391 (4th Cir. 1987), it had "determined that the finding of a qualified and disinterested tribunal" was "such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence." *Id.* at 477–78. The court further noted that "[t]o have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large—that final agency adjudications should carry considerable weight" and "would have produced a result reasonably perceived as unjust and fundamentally unfair." *Id.* at 478.

The instant case may be distinguished from *Lively* and *Albright* because the disability finding was rendered at the initial administrative level and not by an ALJ. [12] Unlike the ALJ decisions at issue in *Lively* and *Albright*, the administrative decision in this case does not include a clear rationale to support the decision. *See* Tr. at 56. In the

---

[11] *Albright* clarified the court's prior ruling in *Lively*. In *Lively*, 820 F.2d 1393, the court found that the ALJ erred in concluding the claimant could perform his PRW at the medium exertional level during a period two weeks after a prior final decision had found him to be limited to light work and incapable of performing his PRW. In response to *Lively*, the SSA issued an Acquiescence Ruling ("AR") that absolutely barred claimants in the Fourth Circuit from receiving benefits in subsequent claims if they could not produce new and material evidence that their impairments increased in severity following prior administratively-final decisions. *Albright*, 174 F.3d at 475. In *Albright*, the court explained that the SSA had misinterpreted its holding in *Lively*.

[12] In response to *Albright*, the SSA issued Acquiescence Ruling ("AR") 00-1(4) (S.S.A.), 2000 WL 43774, which requires ALJs to consider the following if a prior claim has been decided by an ALJ or the Appeals Council: (1) whether the fact on which the prior finding was based was subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that had elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provided a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

absence of an explanation for the prior finding of disability, it is unclear whether the Fourth Circuit would find the ALJ was required to explain his reasons for deviating from it.

Pursuant to 42 U.S.C. § 423(d)(5)(B), the ALJ is required to consider all of the available evidence in the claimant's case record, including "decisions by other governmental and nongovernmental agencies about whether an individual is disabled or blind." 20 C.F.R. § 416.912(b)(1)(v). "[U]nder the principles governing SSA disability determinations, another agency's disability determination 'cannot be ignored and must be considered.'" *Bird v. Commissioner of Soc. Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012), citing SSR 06-03p.[13] Because the ALJ would have been required to consider the prior disability decision if it were rendered by another agency, it follows that the ALJ was required to consider a prior decision rendered by the SSA.

While it is unclear the extent to which an ALJ deciding a subsequent claim is required to address a prior finding of disability made at the initial agency level, the Fourth Circuit's holdings in *Lively*, *Albright*, and *Bird* suggest that the decision cannot be ignored. In the instant case, the ALJ noted that "[c]laimant testified that he previously received disability benefits but that they were terminated because he was incarcerated." Tr. at 24. The ALJ wrote the following:

> The degree of limitation alleged by claimant and Mr. Hall is not supported by the medical evidence. Therefore, their testimony is given little weight. In particular, despite claimant and Mr. Hall's reports that claimant has been

---

[13] The SSA recently rescinded SSR 06-3p. Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017). The rescission is inapplicable to Plaintiff's claim because it applies only to claims filed after March 27, 2017. *See id.*

> hospitalized in psychiatric facilities numerous times, the record contains no treatment notes associated with such alleged hospitalizations. Moreover, despite testimony that claimant's mental illness began as early as 1998, the record contains no mental health treatment records until approximately June 2012 (Exhibit 1F) Regarding claimant's multiple incarcerations, the evidence contains records from only one incarceration, which was from approximately June 2012 to February 2013. (Exhibit 1F).

Tr. at 25. Thus, the ALJ did not find that Plaintiff's impairment had improved since the prior disability decision, but instead expressed doubt regarding the accuracy of the impairment history that Plaintiff and his father reported.[14] Although the ALJ acknowledged Plaintiff's and his father's testimony, he did not concede that the record included a prior administrative finding of disability. Therefore, it appears the ALJ ignored the agency's prior finding of disability in determining that Plaintiff was not disabled.

In light of Plaintiff's allegation that he had been disabled based on his mental impairments since 1998, the agency's termination of benefits for non-medical reasons, and the ALJ's failure to consider the prior disability finding, the undersigned recommends the court find that substantial evidence does not support the ALJ's decision.

2.      Use of Medical-Vocational Guidelines

Plaintiff argues the ALJ erred in relying on the medical-vocational guidelines to direct a finding that he was not disabled. [ECF No. 10 at 15]. He maintains that the ALJ did not adequately consider his non-exertional impairments. *Id.* at 16. He contends that the ALJ's finding that he had moderate limitations in concentration, persistence, or pace

---

[14] The impairment history described in Plaintiff's and his father's testimony would have presumably supported the prior finding of disability.

and social functioning necessitated testimony from a vocational expert ("VE") to show that he could perform jobs that existed in significant numbers. *Id.* at 17–18.

The Commissioner argues the ALJ reasonably relied on SSR 85-15 in finding that Plaintiff's mental impairments would allow him to perform nearly the full occupational base for unskilled work. [ECF No. 11 at 11]. She maintains that the ALJ provided ample evidence to support his RFC finding in light of his determination that Plaintiff had moderate limitations in concentration, persistence, or pace and social functioning. *Id.* at 14.

If a claimant's RFC does not allow him to perform his PRW, the analysis proceeds to a fifth step where the burden shifts to the Commissioner to show that the individual is capable of performing jobs that exist in significant numbers in the economy. *Walls*, 296 F.3d at 290, citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). At the fifth step, the ALJ must consider the claimant's RFC in combination with his age, education, and work experience. SSR 83-10. The table rules in Appendix 2 to Subpart P of Part 404, which are known as the medical-vocational guidelines or "grid rules," direct findings of "disabled" or "not disabled" based on an individual's maximum sustained work capability, age, education, and previous work experience. *See id.* "Each grid considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989).

"[W]here a person has solely a nonexertional impairment[s], the table rules do not direct conclusions of disabled or not disabled." SSR 85-15. "Conclusions must, instead,

be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in Appendix 2." *Id.* If an individual has no medically-determinable impairment that limits his exertional capacity, "the first issue is how much the person's occupational base—the entire exertional span from sedentary through heavy (or very heavy) work—is reduced by the effects of the nonexertional impairment(s)." *Id.* "This may range from very little to very much, depending on the nature and extent of the impairment(s)." *Id.* "In many cases, a decisionmaker will need to consult a vocational resource." *Id.*

To meet the burden to produce specific vocational evidence showing that the national economy provides employment opportunities, it is often necessary for the ALJ to solicit the services of a VE. *See Walker*, 889 F.2d at 50; *see also Aistrop*, 36 F. App'x at 147 (where the individual has both exertional and nonexertional impairments that prevent him from performing a full range of work at a given exertional level, "the Commissioner must prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform").

The ALJ found that Plaintiff had the RFC to perform work at all exertional levels, but was limited to "understand[ing], remember[ing] and carry[ing] out simple instructions" with "no ongoing public interaction." Tr. at 24. He found that Plaintiff's "ability to perform work at all exertional levels ha[d] been compromised by nonexertional limitations," but that those "limitations had little or no effect on the occupational base of unskilled work at all exertional levels." Tr. at 28. He determined that "[a] finding of 'not disabled'" was "appropriate under section 204.00 of the Medical-

Vocational Guidelines." *Id.* He stated "[t]he limitation to understanding, remembering, and carrying out simple instructions" and for "no ongoing public interaction would not preclude unskilled work which primarily involves working with objects rather than people." *Id.*

The ALJ based his determination that Plaintiff was not disabled on medical-vocational guideline 204.00, which addresses a maximum sustained work capability limited to heavy or very heavy work as a result of severe medically-determinable impairments. 20 C.F.R. Part 404, Subpart P, App'x 2, § 204.00. An RFC to perform heavy or very heavy work "represents substantial work capability for jobs in the national economy at all skill and physical demand levels." *Id.* The ALJ relied on the following language from SSR 85-15 in determining that the occupational base for unskilled work at all exertional levels would not be compromised by the nonexertional limitations he included in the RFC assessment:

> Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

Pursuant to medical-vocational guideline § 204.00, "[i]ndividuals who retain the functional capacity to perform heavy work (or very heavy work) ordinarily will not have a severe impairment or will be able to do their past work—either of which would have already provided a basis for a decision of 'not disabled.'" 20 C.F.R. Part 404, Subpart P, App'x 2, § 204.00. Thus, a finding that Plaintiff was "not disabled" based on this

medical-vocational guideline was inconsistent with the ALJ's finding that Plaintiff had a severe mental impairment and the fact that Plaintiff had no PRW.

In *Burris v. Astrue*, the court considered an ALJ's reliance on the medical-vocational guidelines and SSR 85-15 to support a finding that the plaintiff was "not disabled" where the ALJ assessed similar nonexertional limitations to those assessed by the ALJ in the instant case. *Compare* Tr. at 24 (finding Plaintiff had the RFC to perform a full range of work at all exertional levels that involved understanding, remembering, and carrying out simple instructions and required no ongoing public interaction), *with Burris v. Astrue*, No. 8:10-94-JDA, 2011 WL 3876985, at *12 (D.S.C. Aug. 31, 2011), (noting the ALJ found the plaintiff to have an inability to perform "detailed or complex tasks or work requiring more than occasional contact with the public"). The court found that the ALJ had "ignored the further description of unskilled work in SSR 85-15, which indicates that '[t]he basic mental demands of competitive, remunerative, unskilled work include[s] the ability[y] (on a sustained basis) . . . to respond appropriately to supervision, coworkers, and usual work situations'" and that the limitation of Plaintiff's "on-the-job social interaction" would "directly conflict with the basic demands of unskilled work." *Burris*, 2011 WL 3876985, at *12; *see also Haselden v. Astrue*, No. 9:10-545-CMC-BM , 2011 WL 2034457, at *3 (D.S.C. May 23, 2011) (finding that in relying solely on the first description of unskilled work in SSR 85-15, the ALJ ignored that the assessed RFC conflicted with the basic demands of unskilled work provided in the second description in SSR 85-15). "Consequently, in relying exclusively on the grids, the ALJ failed to address the impact of Plaintiff's nonexertional limitation on the jobs available that Plaintiff could

perform." *Id.* In light of the court's holdings in *Burris* and *Haselden* and the ALJ's assessment of a similar RFC in the instant case, it appears that the restriction to no ongoing interaction with the general public would conflict with Plaintiff's ability to meet the basic demands of unskilled work.

Furthermore, a finding of disability based on medical-vocational guideline § 204.00 is inconsistent with the ALJ's earlier findings that Plaintiff had moderate difficulties in social functioning and concentration, persistence, or pace (Tr. at 23). *See Landrum v. Astrue*, No. 08-2678-TLW-JRM, 2010 WL 558599, at *7 (D.S.C. Feb. 10, 2010) (finding the ALJ's decision to rely on the medical-vocational guidelines instead of obtaining testimony from a VE was unsupported by substantial evidence where he had found the plaintiff to have "mild to moderate difficulties as to her concentration"); *Burris*, 2011 WL 3876984, at *12–13 (finding that "because the ALJ found Plaintiff to have severe mental impairments, resulting in mild limitations in daily activities, moderate limitations in social functioning, and mild limitations in concentration . . . the ALJ was required to use a vocational expert to establish the claimant's ability to perform other work"); *Bonds v. Astrue*, No. 6:07-1135-JFA-WMC, 2008 WL 2952446, at *11 (D.S.C. July 29, 2008) (finding the ALJ erred in relying on the medical-vocational guidelines to direct a finding of "not disabled" where the plaintiff had mild-to-moderate concentration deficits). In *Burris* and *Bonds*, the court quoted *Chapa v. Astrue*, No. 2:05-0253, 2008 WL 953947, at *11 (N.D. Tex. April 8, 2008), which provided as follows:

> Plaintiff's nonexertional impairment of moderate limitation in the area of concentration, persistence and pace could directly affect plaintiff's ability

to remain attentive and concentrate.[15] This could directly affect plaintiff's ability to perform simple sedentary work, such as assembly line work, unskilled in nature, which the ALJ found plaintiff capable of performing. It may be that a vocational expert would find limitations in the area of concentration, persistence and pace, would affect such jobs and further erode the number of unskilled sedentary jobs available.

In light of the foregoing authority, the undersigned recommends the court find the ALJ erred in relying on medical-vocational guideline 204.00 and SSR 85-15 to find Plaintiff was capable of performing jobs that existed in significant numbers in the national economy. Given Plaintiff's mental impairment and nonexertional limitations, the ALJ should have consulted a VE.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

---

[15] The undersigned notes that the Fourth Circuit stated similar reasoning in finding that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work'" in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015).

IT IS SO RECOMMENDED.

June 13, 2017

Columbia, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).